UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MOSAIC UNDERWRITING SERVICE, INC. ET AL.       CIVIL ACTION

VERSUS                                         NO. 12-2183

MONCLA MARINE OPERATIONS, L.L.C. ET AL.        SECTION "F"


ORDER AND REASONS

Before the Court is Moncla Marine's motion to compel arbitration and stay proceedings.  For the reasons that follow, the motion is DENIED with respect to compelling arbitration, and GRANTED with respect to issuing a stay.

Background

This dispute arises out of the salvage of a damaged vessel.

The MONCLA 101, owned and operated by Moncla Marine Operators, LLC, is a "work-over barge" or "post-drilling rig," used to drive pilings and posts in maritime environments.  On or about May 5, 2012, the MONCLA 101 was onsite at Calliou Island in Terrebonne Bay, Louisiana, performing a job for one of Moncla's customers, Hilcorp.  In accordance with its design, the MONCLA 101 was deliberately flooded; an operation which involves filling the hull portion of the rig with water to ballast it down so that it sits on the seabed. On June 13, 2012, during efforts to deballast, Moncla Marine was unable to raise and refloat the vessel because of multiple holes in the hull.

1

With the MONCLA 101 still sitting on the seabed, Moncla Marine hired divers to apply patches to the hull, but these efforts proved futile.  Moncla Marine then retained a salvage company, Inland Salvage, Inc., to raise the vessel.  Moncla Marine entered into a $3.55 million "no cure-no pay" contract with Inland Salvage to remove the MONCLA 101 from the seabed. Island Salvage successfully floated the vessel, and, on July 14, 2012, the MONCLA 101 was towed to the Bollinger Shipyard in LaRose, Louisiana, where it remains today.

At all relevant times, Moncla Marine had numerous insurance policies covering the MONCLA 101, which can best be grouped in three categories: (1) Hull & Machinery Policy,[1] (2) Primary Protection & Indemnity Policy,[2] and (3) Excess Protection & Indemnity Policy;[3] the Hull Underwriters, Primary P&I Underwriters, and Excess P&I Underwriters.  The Hull & Machinery

---

[1] This includes Lloyds Syndicates numbers 2987, 2007, 4711, 382, 3000, 4020, 2001, and 2488, all of whom subscribed to and/or secured Hull and Machinery Policy Number B0702HA037000b, which was issued to Moncla Marine.

[2] This includes Lloyds Syndicates numbers 2003, 609, 2987, 1225, 2488, 4711, 2121, 1183, 1221, 457, and 300, all of whom subscribed to and/or secured the Primary Protection and Indemnity Policy Number B0702PA018140b issued to Moncla Marine.

[3] This includes Mosaic Underwriting Service, on behalf of Lloyds Syndicate number 1861, and Navigators Insurance Company, Inc., which issued Excess Protection and Indemnity Policy Number MUS334191-12-1 to Moncla Marine.  Navigators Insurance is a 50% subscriber to the Excess P&I Policy, utilizing policy number HO12LIA245101.

policy and the Primary P&I policy were obtained through the Osprey Underwriting Agency, Ltd.  All three policies were underwritten by multiple syndicates on a subscription basis at Lloyds of London.

The costs for the removal of the MONCLA 101, which total approximately $3.55 million, were covered by the Primary P&I and the Excess P&I Underwriters.  The Primary P&I Underwriters paid $1 million to Inland Salvage and the Excess P&I Underwriters paid $2.55 million.

On August 31, 2012, the Excess P&I Underwriters sued for a declaratory judgment in this Court, naming as defendants the MONCLA 101, in rem, and Moncla Marine, in personam.  Excess P&I Underwriters seek a declaration that they are entitled to take title to the vessel, sell the vessel, and have priority over claims once the proceeds are distributed among claimants.  On November 13, 2012, Moncla Marine denied Excess P&I Underwriters' claims and affirmatively asserted a counterclaim against Excess P&I, alleging claims of negligence under Louisiana Civil Code articles 2315, 2316, 2320; conspiracy and collusion under article 2324; fraud; violations of the Louisiana Unfair Trade and Practices Act; breach of fiduciary duty; and detrimental reliance.  In addition to other damages and fees, Moncla Marine seeks a claim for punitive damages.

On the same day, November 13, 2012, Moncla Marine also filed

3

a third-party complaint in this Court, naming as third-party defendants Osprey Underwriting, the Hull Underwriters, and the Primary P&I Underwriters.  Moncla Marine asserts essentially the same claims in its third-party complaint as it does in its counterclaim against the Excess P&I Underwriters; in sum, Moncla Marine asserts ten causes of action against the Hull Underwriters, eight against the Primary P&I Underwriters, and seven against Osprey.  The crux of Moncla Marine's claims against the Express P&I, Hull, and Primary P&I Underwriters is that all underwriters conspired and colluded to compensate Moncla Marine under the Primary and Excess P&I policies, rather than the Hull policy.  By doing so, it is argued, the P&I Underwriters would receive a credit for the salvage value of the MONCLA 101, which would be available under the terms of the Primary and Excess P&I policies but not the Hull policy.

On December 6, 2012, the third-party defendants, invoking the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, moved the Court to stay proceedings and compel arbitration in London pursuant to the insurance policies' arbitration clauses.  The Court granted the motion on February 20, 2013, and the proceedings between Moncla Marine and the Hull Underwriters, Primary P&I Underwriters, and Osprey were stayed. Excess P&I Underwriters' claims against Moncla Marine remained pending before this Court.  Moncla Marine now moves to stay

4

proceedings and compel Excess P&I Underwriters to arbitrate their claims in the third-party defendants' London arbitration.

<u>Discussion</u>

*I.*

*A.*

"Arbitration is a matter of contract between parties, and a court cannot compel a party to arbitrate a dispute unless the court determines the parties agreed to arbitrate the dispute in question." <u>Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.</u>, 139 F.3d 1061, 1064 (5th Cir. 1998). Therefore, a court must perform a two-step inquiry to determine whether to compel a party to arbitrate. <u>Dealer Computer Servs., Inc. v. Old Colony Motors, Inc.</u>, 588 F.3d 884, 886 (5th Cir. 2009). First, the court must determine whether the parties agreed to arbitrate the dispute. <u>Id.</u> Second, once the court finds that the parties agreed to arbitrate, it must determine whether any applicable federal statute or policy renders the claims nonarbitrable. <u>Id.</u> When addressing the first question, there are two considerations: whether a valid agreement to arbitrate exists and whether the dispute falls within that agreement. <u>Id.</u>; <u>see also</u> <u>Will-Drill Res., Inc. v. Samson Res. Co.</u>, 352 F.3d 211, 214 (5th Cir. 2003). "Beyond this analysis, the courts generally do not delve further into the substance of the parties' disputes." <u>Id.</u>

If a valid agreement to arbitrate does not directly exist,

there are nevertheless limited circumstances in which a nonsignatory to an agreement containing an arbitration clause may be compelled to arbitrate in accordance with that clause.  See, e.g., Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 356 (5th Cir.  (2003) ("[F]ederal courts have held that so long as there is some written agreement to arbitrate, a third party may be bound to submit to arbitration."); id. at 358 ("Arbitration agreements apply to nonsignatories only in rare circumstances.") (citing Westmoreland v. Sadoux, 299 F.3d 462, 465 (5th Cir. 2002)).  The Fifth Circuit has recognized six theories for binding a nonsignatory to an arbitration agreement: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) estoppel; and (6) third-party beneficiary.  Id. at 356 (citing Thompson-C.S.F., S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995); E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 195-97 (3d Cir. 2001)).

*B.*

Moncla Marine entered into three contracts for marine insurance:  (1) Hull & Machinery policy; (2) Primary P&I policy; and (3) Excess P&I policy.  For reasons unknown to the Court, the Hull and Primary P&I policies contain arbitration clauses but the Excess P&I policy does not.  Third-party defendants, Hull Underwriters and Primary P&I Underwriters, compelled Moncla

6

Marine to arbitrate in London pursuant to the arbitration clauses in their respective insurance policies.  Therefore, under step one of the two-part inquiry, the Court finds that the Excess P&I Underwriters have not agreed to arbitrate, because the Excess P&I policy does not itself include an arbitration provision and the Excess P&I Underwriters are not a signatory to the Hull or Primary P&I policies.  As a result, the Court need not consider the second step of the two-party inquiry.  Rather, the Court must consider whether the Excess P&I Underwriters can still be compelled to arbitrate in accordance with the third-party defendants' arbitration clauses in light of the six theories by which a nonsignatory may be bound to an arbitration agreement.[4] The Court finds that none of the six theories bind the Excess P&I Underwriters.

*(1)  Incorporation by Reference*

"A nonsignatory may be bound by a written provision that is not included in an agreement to which it is a party if that provision has been incorporated by reference."  <u>Silva v.</u>

---

[4]  It is important to note that although Moncla Marine requests the Court to compel the Excess P&I Underwriters to arbitrate, Moncla Marine fails to cite or argue the relevant legal standard for compelling a party to arbitrate.  Instead, Moncla Marine cites the test regarding when a court can enter a stay pending the outcome of ongoing arbitration, which, although related, is different from compelling a party to arbitrate.  Further, Moncla Marine failed to address the correct legal standard even after the Excess P&I Underwriters identified it in their opposition memorandum and the Court rescheduled the hearing date on this motion.

Frankford Crossing Shopping Ctr., TX, LP, No. 12-2046, 2013 WL
1264155, at *5 (citing Hellenic Inv. Fund, Inc. v. Det Norske
Veritas, 464 F.3d 514, 517 (5th Cir. 2006)).   Excess P&I
Underwriters contend that although the Excess P&I policy
incorporates the standard SP-23 form on which the Primary P&I
policy is based, the Excess P&I policy does not incorporate the
Primary P&I policy in its entirety.   P&I policies confer
liability coverage for maritime operations to vessel owners under
a variety of forms, such as the "SP-23" or "SP-38," which are two
of the most common forms.   These forms provide boilerplate
language on the type and extent of coverage, and are incorporated
into most maritime insurance contracts.[5]   The SP-23 form does not
contain any provision regarding arbitration, and the fact that
the Excess P&I policy incorporates the standard SP-23 language
does not mean the Excess P&I policy incorporated all provisions
of the Primary P&I policy.   This is supported by the fact that
the Excess P&I policy contains provisions that indicate certain
instances in which excess coverage differs from primary coverage.
For instance, in the event that recovery is unavailable under the
Primary P&I policy because of insolvency or bankruptcy, Excess
P&I coverage still applies in excess of the limit of liability
specified in the Primary P&I policy.   Further, service on the

---

[5]   Compare 7A E. BENEDICT, BENEDICT ON ADMIRALTY § 2.01 (standard SP-23
P&I insurance form), with Rec. Doc. 7-4 (Primary P&I policy in
this case).

underwriters of one policy does not accomplish service on the other. Without a more clear indication that the Express P&I policy intended to incorporate the Primary P&I policy's arbitration clause, this exception does not apply.

*(2) Assumption*

"In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate." Thomson-CSF, 64 F.3d at 777; see also Ace Am. Ins. Co. v. Huntsman Corp., 255 F.R.D. 179, 193 (S.D. Tex. 2008). To be bound under the assumption theory, a nonsignatory must show a clear intent to arbitrate the dispute. See Ace, 255 F.R.D. at 193. Excess P&I Underwriters filed suit in this Court; they have not asserted any claims against the third-party defendants or intervened in the third-party defendants' arbitration. The Court cannot find, based on the record before it, that the Excess P&I Underwriters have taken any action evidencing an intent to arbitrate. Absent such a showing of intent, the assumption exception cannot apply. Id.; see also Castlewood (US), Inc. v. Nat'l Indem. Co., No. 06-6842, 2006 WL 3026039, at *5 (S.D.N.Y. Oct. 24, 2006).

*(3) Agency*

"Agency is 'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent

9

by the other so to act.'"  Bridas, 345 F.3d at 356-57 (quoting

Restatement (Second) of Agency § 1.1 (1958)).  The burden is on

Moncla Marine to show that the Hull Underwriters, or, more

likely, the Primary P&I Underwriters, signed their insurance

policies as an agent of the Excess P&I Underwriters and not for

themselves alone.  See id.; see also East Tex. Med. Ctr. Reg'l

Healthcare Sys. v. Slack, No. 12-307, 2013 WL 56136, at *2 (E.D.

Tex. Jan. 3, 2013).  Moncla Marine presents no argument or

evidence supporting an agency relationship.  The nature of the

insurance policies--that the Excess P&I policy becomes operable

after the Primary P&I policy is exhausted--does not automatically

create an agency relationship between the Primary P&I

Underwriters and the Excess P&I Underwriters.  Both the primary

and excess insurer separately entered into an insurance contract

with Moncla Marine.  Although Moncla Marine suggests some sort of

agency relationship in its counterclaim regarding manipulation of

coverage, the agency question for purposes of binding a

nonsignatory involves the formation of the contract.  Therefore,

this theory also does not bind the Excess P&I Underwriters to the

arbitration clause.

*(4) Veil-piercing/Alter ego*

     In order to pierce the corporate veil to hold an alter ego

liable, a parent-subsidiary relationship must exist.  See Bridas,

345 F.3d at 358-60.  Moncla Marine has failed to demonstrate the

10

existence of a parent-subsidiary relationship between the Primary P&I and Excess P&I Underwriters and, therefore, this theory does not apply.[6]

*(5) Estoppel*

    The Fifth Circuit has recognized two types of equitable estoppel in the context of arbitration agreements.  The first type "applies only to prevent a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Bridas, 345 F.3d at 361.  The Fifth Circuit reasoned that "[b]ecause arbitration is guided by contract principles, the reverse is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with

---

[6]  The factors normally considered in the context of parent-subsidiary alter ego claims include whether (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; and (12) the subsidiary does not observe corporate formalities. Bridas, 345 F.3d at 360 n.11.  Although Moncla Marine alleges in its third-party complaint that "several of the underwriters subscribing to the Hull Policy also subscribed to the P&I Policy," there is no other information provided to support a parent-subsidiary relationship much less an alter ego theory.

another signing party." Id. (internal quotation marks omitted). This first type of estoppel does not apply in this case because the nonsignatory is the party seeking to avoid arbitration. See also id. ("It is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others." (internal quotation marks omitted)); Wood v. Penntex Res., L.P., 458 F. Supp. 2d 355, 365-66 (S.D. Tex. 2006) (finding that the first type of estoppel did not apply because a party to the contract containing an arbitration clause was attempting to enforce that clause against a nonparty).

The second type of estoppel is recognized as direct-benefits estoppel. "Direct benefits estoppel applies when a nonsignatory knowingly exploits the agreement containing the arbitration clause." Bridas, 345 F.3d at 361-62 (internal quotation marks omitted). The Fifth Circuit in Bridas S.A.P.I.C. v. Government of Turkmenistan declined to apply direct-benefits estoppel in part because the nonsignatory had not sued the signatory under the agreement containing the arbitration clause and therefore had not "exploited" the agreement. Id. Other courts within the Fifth Circuit have also focused on whether the evidence shows that the nonsignatory received a direct and substantial benefit from the agreement:

> The keys are whether the nonsignatory demanded and received substantial and direct benefits under the contract containing the arbitration clause, by suing the signatory under the contract or otherwise; the relationship between the claims to be arbitrated and the contract; and whether equity prevents the nonsignatory from avoiding the arbitration clause that was part of the contract.

Wood, 458 F. Supp. 2d at 371.  Here, it is undisputed that Excess P&I Underwriters did not sue Moncla Marine under the Hull or Primary P&I policies.  There is also no evidence that the Excess P&I Underwriters "demanded and received" substantial and direct benefits under the Hull or Primary P&I Policy.  Cf. id. at 370-71 (concluding that the nonsignatory had received direct and substantial benefits because he had participated in negotiating the relevant agreement with the arbitration clause, was named in the agreement, and had been involved in the agreement's execution and performance); Legacy Wireless Servs., Inc. v. Human Capital, L.L.C., 314 F. Supp. 2d 1045, 1056 (D. Or. 2004) (finding that a nonsignatory received direct benefits, because under the agreement with the arbitration clause one party was to pay the other administrative fees, and the party receiving the administrative fees was obligated to pay a percentage of those fees to the nonsignatory under a separate agreement).

*(6)  Third-party Beneficiary*

Although similar to estoppel, the third-party beneficiary doctrine is distinct:

> Under the third party beneficiary theory, a court

must look to the intentions of the parties at the time
the contract was executed.  Under the equitable estoppel
theory, a court looks to the parties' conduct after the
contract was executed.  Thus, the snapshot [the court]
examines under equitable estoppel is much later in time
than the snapshot for the third party beneficiary
analysis.

Bridas, 345 F.3d at 362 (quoting DuPont, 269 F.3d at 200 n.7).

"[T]he fact that a person is directly affected by the parties'

conduct, or that he may have a substantial interest in a

contract's enforcement, does not make him a third-party

beneficiary."  Id. (quoting DuPont, 269 F.3d at 200 n.7).  Excess

P&I Underwriters have an obvious interest in the enforcement of

the Hull and Primary P&I policies, because the enforcement of

those policies will determine whether or not Excess P&I's policy

is implicated.  But the Fifth Circuit has instructed that this

fact alone does not make Excess P&I Underwriters a third-party

beneficiary.  Further, "[p]arties are presumed to be contracting

for themselves only. . . . This presumption may be overcome only

if the intent to make someone a third-party beneficiary is

clearly written or evidenced in the contract."  Id. (citations

and internal quotation marks omitted).  The Court cannot find,

based on this record, that the Hull and Primary P&I policies show

the requisite clear intent to benefit the Excess P&I

Underwriters.  In addition, the Fifth Circuit has expressed

reluctance in binding a nonsignatory on the third-party

beneficiary theory when the nonsignatory never filed a claim

14

against the signatory premised upon the agreement, or otherwise sought to enforce its terms. Id. (citing DuPont, 269 F.3d at 192; Indus. Elec. Corp. of Wis. v. iPower Distribution Grp., Inc., 215 F.3d 677 (7th Cir. 2000); TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc., 915 F.2d 1351, 1354 (9th Cir. 1990)). Therefore, the Court finds Express P&I Underwriters are not bound under this theory.

II.

In arguing its motion to compel arbitration, Moncla Marine also requests a stay. The Court finds a discretionary stay, not a mandatory stay, appropriate here.

A.

Under section 3 of the Federal Arbitration Act,[7] a district court must stay a lawsuit when one party demonstrates that any issue involved in the lawsuit is "referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3 (2006); Tittle v. Enron Corp., 463 F.3d 410, 417 n.6 (5th Cir. 2006) ("[A] stay is mandatory at the request of a party if the dispute is arbitrable . . . "). "If a mandatory stay under section 3 is not applicable, a court may still exercise its

---

[7]  The third-party defendants' compelled arbitration by invoking the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, which incorporates the entirety of the FAA. The Court discussed how the Convention incorporates, and is even considered broader than the FAA, at length in its February 20, 2013 Order and Reasons in this case. See Rec. Doc. 44.

15

discretion to stay litigation, even as to claims of
nonsignatories, pending the outcome of arbitration, as a means of
controlling and managing the docket." Suzlon Infrastructure,
Ltd. v. Pulk, No. 09-2206, 2010 WL 3540951, at *4 (S.D. Tex.
Sept. 10, 2010); see also Ambraco, Inc. v. Bossclip B.V., 570
F.3d 233, 243 (5th Cir. 2009) ("[A] district court's
discretionary authority to issue a stay 'is incidental to the
power inherent in every court to control the disposition of the
c[a]ses on its docket with economy of time and effort for itself,
for counsel, and for litigants.'") (quoting Landis v. N. Am. Co.,
299 U.S. 248, 254-55 (1936)); Complaint of Hornbeck (1984) Corp.,
981 F.2d 752, 755 (5th Cir. 1993) ("[I]t will lie within the
district court's discretion to stay the claims between the
nonarbitrating parties pending outcome of arbitration simply as a
means of controlling its docket." (citing Moses H. Cone Mem'l
Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20 n.23 (1983))).

In Waste Management v. Residuos Industriales Multiquim,
S.A., a nonsignatory defendant sought to stay litigation of
claims asserted against it by a signatory plaintiff.  372 F.3d
339, 343 (5th Cir. 2004).  The Fifth Circuit enumerated three
factors for a court to consider when a nonsignatory invokes a
section 3 stay:  (1) the arbitrated and litigated disputes must
involve the same operative facts; (2) the claims asserted in the
arbitration and litigation must be "inherently inseparable"; and

16

(3) the litigation must have a critical impact on the

arbitration.  372 F.3d 339, 343 (5th Cir. 2004) (citing Hill v.

Gen. Elec. Power Sys., Inc., 282 F.3d 343, 347 (5th Cir. 2002);

Harvey v. Joyce, 199 F.3d 790, 795-96 (5th Cir. 2000)).  In this

case, unlike Waste Management, a signatory to the arbitration

agreement (Moncla Marine) is requesting the stay against a

nonsignatory (Excess P&I Underwriters).  Excess P&I Underwriters

contend that this distinction is notable, and, relying on East

Texas Medical Center Regional Healthcare System v. Slack, argue

that "no authority" exists for the proposition that a signatory

defendant can stay a nonsignatory plaintiff's litigation.  2013

WL 56136, at *3.  In East Texas, the court acknowledged that "the

stay provision under § 3 typically applies to nonsignatory

defendants where the signatory plaintiff was compelled to

arbitrate."  Id.  The court, however, went on to state:

> Even if **nonsignatory defendants** could invoke the stay
> provision of § 3 upon a **nonsignatory plaintiff**--a
> proposition for which Defendants provide no authority,
> and the Court is aware of none--Defendants have not shown
> that the claims . . . in arbitration stemming from the
> state court action and the claims [plaintiff] asserts
> before this Court are inherently inseparable.

Id.  In extrapolating from the Waste Management holding, that

involved a nonsignatory defendant and signatory plaintiff, the

court in East Texas contemplated a nonsignatory defendant-

nonsignatory plaintiff situation, which is not the situation

here.[8]  Id.  Further, contrary to Excess P&I Underwriters' assertion that no authority exists to support the proposition that a signatory defendant can stay a case against a nonsignatory plaintiff, the Court points to Halliburton Energy Services, Inc. v. NL Industries:

> In deciding motions to compel, the courts have distinguished between allowing a nonsignatory to enforce an arbitration agreement against a signatory and allowing a signatory to enforce an arbitration agreement against a nonsignatory.  The courts have held that the principles allowing a nonsignatory to enforce an arbitration clause against a signatory may not allow a signatory to enforce arbitration against a nonsignatory. . . .
>      In deciding a motion to stay litigation pending arbitration as opposed to a motion to compel arbitration, however, the courts have applied similar factors when the stay is sought by a nonsignatory as to claims involving a signatory, as in Waste Management, or by a signatory as to claims involving a nonsignatory, as in the present case.

No. 05-4160, 2007 WL 268492, at *7 (S.D. Tex. Jan. 26, 2007). Accordingly, the fact that a signatory defendant is seeking a stay against a nonsignatory plaintiff is not dispositive in this case.  The Court now turns to the Waste Management factors and whether a stay is mandatory or discretionary.

B.

Under the first Waste Management factor, the Court must examine whether the arbitration and litigated disputes involve

---

[8] The Court notes that it is unclear as to whether the court in East Texas, based on the facts, intended to reference signatory defendant and nonsignatory plaintiff.  Regardless, the express language suggests otherwise, and authority exists to support the signatory defendant-nonsignatory plaintiff assertion.

the same operative facts. 372 F.3d at 343. Moncla Marine asserts that the same operative facts are involved in both proceedings because all claims, counterclaims, and third-party demands arise from the casualty and salvage of the MONCLA 101. Specifically, Moncla Marine contends that the ultimate issues to be resolved include whether (1) Moncla is entitled to Hull or P&I coverage, (2) Moncla Marine's primary underwriters are entitled to void Moncla's policies ab initio, and (3) Moncla Marine's insurers committed certain tortious acts with regard to their handling of Moncla's claim.

In response, Excess P&I Underwriters acknowledge that all claims, at some level, stem from the loss and salvage of the vessel. Excess P&I submits, however, that the claims subject to arbitration deal with the Primary P&I and Hull insurance policies, whereas Excess P&I Underwriters' claims do not involve those policies or challenge any coverage under them. Rather, Excess P&I asserts that their claim is simple: Excess P&I Underwriters paid $2.55 million for the removal of the vessel and according to the terms of the Excess P&I policy, they are entitled to a salvage credit.

Excess P&I Underwriters' overlook the fact that the bulk of Moncla Marine's claims allege that the Hull, Primary P&I, and Excess P&I Underwriters manipulated coverage to ensure that the salvage was covered under the P&I policies and not the Hull

19

policy.  Once resolved, this issue could seriously affect Excess
P&I Underwriters' right to a salvage credit.  Therefore, although
the operative facts might not be identical to command a mandatory
stay, the facts do overlap extensively and weigh in favor of a
discretionary stay.  See Suzlon, 2010 WL 3540951, at *8 ("Even if
the operative facts are not identical . . . . [the] Waste
Management factor[] weigh[s] heavily in favor of a discretionary
stay. . . . The close relationship between the facts involved in
the federal court claims and the arbitration claims counsels in
favor of staying this litigation.").

    The second Waste Management factor addresses whether the
claims asserted in the arbitration and litigation are inherently
inseparable.  372 F.3d at 343.  Moncla Marine contends that
although Excess P&I Underwriters' claims are not denying
coverage, coverage under the Excess P&I policy is contingent upon
the existence of the Primary P&I policy.  According to the Excess
P&I policy, "[Excess P&I Underwriters] agree to indemnify the
Assured for all liability, loss, damage or expense insured
against under the [Primary P&I policies] . . . ."  Therefore,
Moncla Marine argues that the claims are inherently inseparable.
Excess P&I Underwriters respond that they are not bound to follow
Primary P&I Underwriters' coverage determination.  While the
Excess P&I policy incorporates the SP-23 form on which the
Primary P&I policy is based, the Excess P&I Underwriters submit

20

that the Excess P&I policy has separate applicable law and separate exclusions.  Excess P&I Underwriters continue to explain at length why they are not required to follow Primary P&I Underwriters' coverage position, and agreeing with the Primary P&I Underwriters would be giving them "carte blanche" to control litigation.  The Court finds that the issues might not be "inherently inseparable," but they are intertwined strongly enough to lean in favor of a discretionary stay:  the claims and counterclaims[9] before this Court and the third-party claims at issue in arbitration may ultimately alter Excess P&I's salvage credit.

Last, the Court must consider the third Waste Management factor, which requires determining whether the litigation would have a critical impact on the arbitration.  372 F.3d at 343. Moncla Marine asserts that if the stay is denied, this Court may reach inconsistent results regarding Moncla Marine's claims that the underwriters conspired to manipulate coverage.  Excess P&I Underwriters have also filed a motion to dismiss Moncla Marine's counterclaims.  Even if the Court were to address that motion, and assuming the Court dismisses the counterclaims, the third-party claims (which are nearly identical to the claims Moncla

---

[9]  The Court notes that the Excess P&I Underwriters have also filed a motion to dismiss Moncla Marine's counterclaims.  Because the Court is staying the case, the Court need not address this motion.  The Court further explains its reasons for doing so in its discussion of the third Waste Management factor.

asserts against Excess P&I) still exist and are subject to
arbitration.  The Court finds that potentially reaching the
conclusion that the underwriters did not conspire would affect
the arbitration.  The Fifth Circuit has instructed that "[t]he
question is not ultimately one of weighing the potential harm to
the interests of the nonsignatory, but of determining whether
proceeding with litigation will destroy the signatories' right to
a meaningful arbitration." Id. at 343 (citing Adams v. Ga. Gulf
Corp., 237 F.3d 538, 541 (5th Cir. 2001)).  Given the binding
effect of a federal judgment, as well as the factual similarities
in the claims asserted against the third-party defendants, it is
not unreasonable to believe that the arbitrator would be
influenced to follow the Court's determination.  Therefore, even
if the first two Waste Management factors do not support a
mandatory stay, all three factors weigh in favor of a
discretionary stay.  See Suzlon, 2010 WL 3540951, at *8 ("Even if
the operative facts are not identical and the claims are not
'inherently inseparable,' the facts and claims significantly
overlap.  The first two Waste Management factors at a minimum
weigh heavily in favor of a discretionary stay."); see also
Shores of Panama, Inc. v. Safeco Ins. Co. of Am., No. 07-602,
2008 WL 4417558, at *7-8 (S.D. Ala. Sept. 29, 2008) (staying
litigation pending arbitration because the litigation required
reaching the merits of an arbitrable claim, thwarting the federal

policy against rendering arbitration redundant); <u>Midland Walwyn Capital Inc. v. Spear, Leeds & Kellogg</u>, No. 92-2236, 1992 WL 249914, at *2 (S.D.N.Y. Sept. 22, 1992) ("Courts . . . have repeatedly granted stays pending arbitration where the nonarbitrable issues overlap the arbitrable issues, thus minimizing inconsistent results and conserving judicial resources.").

Although the <u>Waste Management</u> factors do not consider whether the outcome of the arbitration would impact litigation (the third factor asks the reverse--the impact of litigation on arbitration), the Court notes that the outcome of arbitration in this case may be helpful to litigation, lending further support to the issuance of a temporary stay. <u>See</u> <u>Suzlon</u>, 2010 WL 3540951, at *9 ("A discretionary stay of this litigation will also enable the court and the parties to benefit from the outcome of the arbitration."); <u>Med-Im Dev., Inc. v. Gen. Elec. Capital Corp.</u>, No. 07-1618, 2008 WL 901489, at *9 (S.D. Tex. Mar. 31, 2008) (granting a discretionary stay because the litigation would "involve much of the same evidence developed in arbitration"); <u>Halliburton</u>, 2007 WL 268492, at *10 ("The [signatory's] arguments as to the effect of the arbitration on the litigation have greater force as arguments in support of a discretionary stay.").

Accordingly, IT IS HEREBY ORDERED that Moncla Marine's motion to compel arbitration and stay proceedings is DENIED in

part as to the request to compel Excess P&I Underwriters' to
arbitrate, and GRANTED in part as to the request for a
discretionary stay.

New Orleans, Louisiana, April 10, 2013

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE