UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

MOSAIC UNDERWRITING SERVICE, INC. ET AL.      CIVIL ACTION

VERSUS                                        NO. 12-2183

MONCLA MARINE OPERATIONS, L.L.C. ET AL.       SECTION "F"

ORDER AND REASONS

Before the Court is Excess P&I Underwriters' motion for reconsideration, or, in the alternative, request for certification to seek interlocutory appeal.  For the reasons that follow, the motion is DENIED.

Background

This dispute arises out of the salvage of a damaged vessel.

The MONCLA 101, owned and operated by Moncla Marine Operators, LLC, is a "work-over barge" or "post-drilling rig," used to drive pilings and posts in maritime environments.  On or about May 5, 2012, the MONCLA 101 was onsite at Calliou Island in Terrebonne Bay, Louisiana, performing a job for one of Moncla's customers, Hilcorp.  In accordance with its design, the MONCLA 101 was deliberately flooded; an operation which involves filling the hull portion of the rig with water to ballast it down so that it sits on the seabed. On June 13, 2012, during efforts to deballast, Moncla Marine was unable to raise and refloat the vessel because of multiple holes in the hull.

1

With the MONCLA 101 still sitting on the seabed, Moncla Marine hired divers to apply patches to the hull, but these efforts proved futile.  Moncla Marine then retained a salvage company, Inland Salvage, Inc., to raise the vessel.  Moncla Marine entered into a $3.55 million "no cure-no pay" contract with Inland Salvage to remove the MONCLA 101 from the seabed. Island Salvage successfully floated the vessel, and, on July 14, 2012, the MONCLA 101 was towed to the Bollinger Shipyard in LaRose, Louisiana, where it remains today.

At all relevant times, Moncla Marine had numerous insurance policies covering the MONCLA 101, which can best be grouped in three categories: (1) Hull & Machinery Policy,[1] (2) Primary Protection & Indemnity Policy,[2] and (3) Excess Protection & Indemnity Policy;[3] the Hull Underwriters, Primary P&I Underwriters, and Excess P&I Underwriters.  The Hull & Machinery

_____

[1] This includes Lloyds Syndicates numbers 2987, 2007, 4711, 382, 3000, 4020, 2001, and 2488, all of whom subscribed to and/or secured Hull and Machinery Policy Number B0702HA037000b, which was issued to Moncla Marine.

[2] This includes Lloyds Syndicates numbers 2003, 609, 2987, 1225, 2488, 4711, 2121, 1183, 1221, 457, and 300, all of whom subscribed to and/or secured the Primary Protection and Indemnity Policy Number B0702PA018140b issued to Moncla Marine.

[3] This includes Mosaic Underwriting Service, on behalf of Lloyds Syndicate number 1861, and Navigators Insurance Company, Inc., which issued Excess Protection and Indemnity Policy Number MUS334191-12-1 to Moncla Marine.  Navigators Insurance is a 50% subscriber to the Excess P&I Policy, utilizing policy number HO12LIA245101.

policy and the Primary P&I policy were obtained through the Osprey Underwriting Agency, Ltd.  All three policies were underwritten by multiple syndicates on a subscription basis at Lloyds of London.

The costs for the removal of the MONCLA 101, which total approximately $3.55 million, were covered by the Primary P&I and the Excess P&I Underwriters.  The Primary P&I Underwriters paid $1 million to Inland Salvage and the Excess P&I Underwriters paid $2.55 million.

On August 31, 2012, the Excess P&I Underwriters sued for a declaratory judgment in this Court, naming as defendants the MONCLA 101, in rem, and Moncla Marine, in personam.  Excess P&I Underwriters seek a declaration that they are entitled to take title to the vessel, sell the vessel, and have priority over claims once the proceeds are distributed among claimants.  On November 13, 2012, Moncla Marine denied Excess P&I Underwriters' claims and affirmatively asserted a counterclaim against Excess P&I, alleging claims of negligence under Louisiana Civil Code articles 2315, 2316, 2320; conspiracy and collusion under article 2324; fraud; violations of the Louisiana Unfair Trade and Practices Act; breach of fiduciary duty; and detrimental reliance.  In addition to other damages and fees, Moncla Marine seeks a claim for punitive damages.

On the same day, November 13, 2012, Moncla Marine also filed

a third-party complaint in this Court, naming as third-party defendants Osprey Underwriting, the Hull Underwriters, and the Primary P&I Underwriters.  Moncla Marine asserts essentially the same claims in its third-party complaint as it does in its counterclaim against the Excess P&I Underwriters; in sum, Moncla Marine asserts ten causes of action against the Hull Underwriters, eight against the Primary P&I Underwriters, and seven against Osprey.  The crux of Moncla Marine's claims against the Express P&I, Hull, and Primary P&I Underwriters is that all underwriters conspired and colluded to compensate Moncla Marine under the Primary and Excess P&I policies, rather than the Hull policy.  By doing so, it is argued, the P&I Underwriters would receive a credit for the salvage value of the MONCLA 101, which would be available under the terms of the Primary and Excess P&I policies but not the Hull policy.

On December 6, 2012, the third-party defendants, invoking the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, moved the Court to stay proceedings and compel arbitration in London pursuant to the insurance policies' arbitration clauses.  The Court granted the motion on February 20, 2013, and the proceedings between Moncla Marine and the Hull Underwriters, Primary P&I Underwriters, and Osprey were stayed. Excess P&I Underwriters' claims against Moncla Marine remained pending before this Court.  On March 12, 2013, Moncla Marine

4

moved to stay proceedings and compel Excess P&I Underwriters to arbitrate their claims in the third-party defendants' London arbitration.   The Court denied Moncla Marine's request to compel Excess P&I Underwriters to arbitrate, but granted the request to stay the litigation on April 11, 2013.   Excess P&I Underwriters now move the Court to reconsider its April 11, 2013 Order and Reasons, or, in the alternative, grant their request to seek interlocutory appeal.

Legal Standards

*I.*

*A.*

Motions requesting reconsideration of court orders generally fall under Rule 59(e) or Rule 60 of the Federal Rules of Civil Procedure.   See Higgins v. Cain, No. 07-9729, 2012 WL 3309716, at *1 (E.D. La. Aug. 13, 2012).   Rule 59(e) provides that a motion to alter or amend a judgment must be filed no later than twenty-eight days after the entry of judgment.   Fed. R. Civ. P. 59(e). Rule 60(b), on the other hand, applies to motions filed after the twenty-eight day period, but demands more "exacting substantive requirements."   See Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 173-74 (5th Cir. 1990), abrogated on other grounds, Little v. Liquid Air Corp., 37 F.3d 1069, 1078 (5th Cir. 1994) (en banc).

Because the Court entered the challenged Order and Reasons

5

on April 11, 2013, and Excess P&I Underwriters filed its motion
to reconsider within twenty-eight days on April 22, 2013, the
motion to reconsider is timely under Rule 59(e), and such
analysis is appropriate.

### B.

"A Rule 59(e) motion 'calls into question the correctness of
a judgment.'" Templet v. Hydrochem, Inc., 367 F.3d 473, 478 (5th
Cir. 2004) (quoting In re Transtexas Gas Corp., 303 F.3d 571, 581
(5th Cir. 2002)).  Because of the interest in finality, Rule
59(e) motions may only be granted if the moving party shows there
was a mistake of law or fact or presents newly discovered
evidence that could not have been discovered previously. Id. at
478-79.  Moreover, Rule 59 motions should not be used to
relitigate old matters, raise new arguments, or submit evidence
that could have been presented earlier in the proceedings.  See
id. at 479; Rosenblatt v. United Way of Greater Hous., 607 F.3d
413, 419 (5th Cir. 2010) ("[A] motion to alter or amend the
judgment under Rule 59(e) 'must clearly establish either a
manifest error of law or fact or must present newly discovered
evidence' and 'cannot be used to raise arguments which could, and
should, have been made before the judgment issued'") (citing
Rosenzweig v. Azurix Corp., 332 F.3d 854, 864 (5th Cir. 2003)
(quoting Simon v. United States, 891 F.2d 1154, 1159 (5th Cir.

1990)).  The grant of such a motion is an "extraordinary remedy that should be used sparingly."  <u>Indep. Coca-Cola Emps.' Union of Lake Charles, No. 1060 v. Coca-Cola Bottling Co. United, Inc.</u>, 114 F. App'x 137, 143 (5th Cir. Nov. 11, 2004) (citing <u>Templet</u>, 367 F.3d at 479).  The Court must balance two important judicial imperatives in deciding whether to reopen a case in response to a motion for reconsideration: "(1) the need to bring the litigation to an end; and (2) the need to render just decisions on the basis of all the facts."  <u>Templet</u>, 367 F.3d at 479.

*II.*

The certification of interlocutory orders for appeal is governed by 28 U.S.C. § 1292(b), which provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

To certify an issue for interlocutory appeal, the appealable issue must involve:  (1) a controlling issue of law; (2) a substantial ground for a difference of opinion; and (3) a question whose immediate appeal from the order will materially advance the ultimate termination of the litigation.  <u>See</u> <u>Aparicio v. Swan Lake</u>, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981).

Interlocutory appeals are "exceptional," the Fifth Circuit cautions, and "assuredly do not lie simply to determine the

7

correctness" of a ruling.  <u>Clark-Dietz & Assocs.-Eng'rs, Inc. v.</u>
<u>Basic Constr. Co.</u>, 702 F.2d 67, 67-69 (5th Cir. 1983); <u>see</u> <u>also</u>
<u>Tolson v. United States</u>, 732 F.2d 998, 1002 (D.C. Cir. 1984)
(citing Wright & Miller for the proposition that Section 1292(b)
"is meant to be applied in relatively few situations and should
not be read as a significant incursion on the traditional federal
policy against piecemeal appeals").

<u>Discussion</u>

*I.*

Excess P&I Underwriters contend that reconsideration is
appropriate because (1) it does not serve the interest of
judicial economy for Excess P&I's claims to be stayed as to
Moncla Marine but not as to the MONCLA 101 in rem; (2) the Court
misapplied case literature from the Eastern District of Texas;
(3) the Court should have ruled on Excess P&I's motion to dismiss
before instituting the stay; and (4) the Court did not undertake
the balancing test required for a discretionary stay as mandated
by the U.S. Supreme Court.  In the alternative, Excess P&I
Underwriters request that the Court certify two issues for
interlocutory appeal.

In light of the Court's April 11, 2013 Order and Reasons and
the Rule 59(e) and § 1292(b) standards, Excess P&I Underwriters
have failed to persuade the Court that it erred in its legal and

factual analysis or that the issue meets all threshold requirements for interlocutory appeal.

*A.*

Excess P&I first asserts that because the Court did not address the MONCLA 101 vessel in its earlier decision, and because the vessel is not a signatory to the third-party defendants' arbitration agreements, Excess P&I's claims against the vessel are not stayed.  Excess P&I is misguided:  a vessel itself does not "sign" a contract, but rather the vessel owners (Moncla Marine, here) enter into insurance agreements for the purpose of insuring their vessels.  The owners are the signatories, not the objects that are being insured.  Excess P&I cannot circumvent the Court's stay by invoking the legal fiction of the vessel's in rem liability.  See, e.g., Cargill B.V. v. S/S Ocean Traveller, 726 F. Supp. 56, 61 (S.D.N.Y. 1989) ("The *in rem* liability of the ship is a legal fiction, nurtured by courts to protect those having claims against elusive ship owners.  A claimant who succeeds in attaching the vessel against which the claim is directed is relieved of the need to circle the globe in efforts to sue and collect from the owner.").  Put simply, "The purpose of the fiction is to simplify the task of suit and collection against ship owners." Id.   In practical terms, notwithstanding the fiction, the dispute remains between the insurer and insured-shipowner in this case.

*B.*

Second, Excess P&I submits that the Court erred by not relying on <u>East Texas Medical Center Regional Healthcare System v. Slack</u>, No. 12-307, 2013 WL 56136 (E.D. Tex. Jan. 3, 2013). Specifically, Excess P&I asserts that the Court's April 11, 2013 decision is "in conflict" with <u>East Texas</u>.  As a threshold matter, although case literature from the Eastern District of Texas may be persuasive, it has no binding authority on this Court.

In <u>East Texas</u>, signatory and nonsignatory defendants requested a stay of proceedings against a nonsignatory plaintiff, because one of the signatory defendants was arbitrating with a twice-removed wholly-owned subsidiary of the nonsignatory plaintiff that was not party to the lawsuit.[4]  <u>Id.</u> at *1.  The court acknowledged that "the stay provision under § 3 typically applies to nonsignatory defendants where the signatory plaintiff was compelled to arbitrate." <u>Id.</u> at *3  The court, however, went on to state:

> Even if ***nonsignatory defendants could invoke the stay*** provision of § 3 ***upon a nonsignatory plaintiff***—a proposition for which Defendants provide no authority, and the Court is aware of none—Defendants have not shown that the claims . . . in arbitration stemming from the state court action and the claims [nonsignatory-

---

[4]  The arbitrating company was a wholly-owned subsidiary of East Texas Medical Center Regional Health Services, Inc., which was a wholly-owned subsidiary of RHS.  <u>East Texas</u>, 2013 WL 56136, at *1.

plaintiff] asserts before this Court are inherently inseparable.

Id. Excess P&I Underwriters contend that the same factual scenario is present in this case: a signatory defendant (Moncla Marine) is attempting to stay the claims of a nonsignatory plaintiff (Excess P&I Underwriters). In its earlier decision, the Court rejected this reasoning based on the plain language of the East Texas decision, stating: "[T]he court in East Texas contemplated a nonsignatory defendant-nonsignatory plaintiff situation, which is not the situation here." In an attempt to liken this case to East Texas, Excess P&I now submits that "the Court also faces a signatory defendant (Moncla Marine Operations) and a nonsignatory defendant (the MONCLA 101 in rem) against a nonsignatory plaintiff." As this Court mentioned (and putting aside the evident factual differences between East Texas and this case, which Excess P&I mistakenly glosses over), the legal fiction of in rem liability cannot be conveniently relied upon to avoid an unsuccessful result.

Excess P&I also submits that the Court's reliance on Halliburton Energy Services, Inc. v. NL Industries is misplaced, because the proceedings against the nonsignatory plaintiff were ultimately not stayed. No. 05-4160, 2007 WL 268492 (S.D. Tex. Jan. 26, 2007). The Court pointed to this case because the following passage summarizes the dilemma posed by Moncla Marine's underlying motion to stay proceedings and compel arbitration:

11

In deciding motions to compel, the courts have
distinguished between allowing a nonsignatory to enforce
an arbitration agreement against a signatory and allowing
a signatory to enforce an arbitration agreement against
a nonsignatory.  The courts have held that the principles
allowing a nonsignatory to enforce an arbitration clause
against a signatory may not allow a signatory to enforce
arbitration against a nonsignatory. . . .
    ***In deciding a motion to stay litigation pending
arbitration as opposed to a motion to compel arbitration,
however, the courts have applied similar factors when the
stay is sought by a nonsignatory as to claims involving
a signatory, as in Waste Management, or by a signatory as
to claims involving a nonsignatory, as in the present
case.***

Id. at *7 (emphasis added).  Therefore, as the Court previously

stated, the mere fact that a signatory defendant is seeking a

stay against a nonsignatory plaintiff is not dispositive in this

case.

*C.*

The Court also erred, according to Excess P&I, by not ruling

on its motion to dismiss Moncla Marine's counterclaims, which

Excess P&I submits was filed before the request for a stay and

would extinguish any "common allegations."  To not rule on the

motion to dismiss, the Court would effectively incentivize

defendants to file baseless counterclaims to ensure that common

allegations exist between arbitration and litigation.  In

deciding to institute a discretionary stay in its April 11, 2013

Order and Reasons, the Court specifically took this argument into

consideration in weighing the Waste Management factors:

Under the first Waste Management factor, the Court must examine whether the arbitration and litigated disputes involve the same operative facts.  372 F.3d at 343.  Moncla Marine asserts that the same operative facts are involved in both proceedings because all claims, counterclaims, and third-party demands arise from the casualty and salvage of the MONCLA 101.  Specifically, Moncla Marine contends that the ultimate issues to be resolved include whether (1) Moncla is entitled to Hull or P&I coverage, (2) Moncla Marine's primary underwriters are entitled to void Moncla's policies ab initio, and (3) Moncla Marine's insurers committed certain tortious acts with regard to their handling of Moncla's claim.

In response, Excess P&I Underwriters acknowledge that all claims, at some level, stem from the loss and salvage of the vessel.  Excess P&I submits, however, that the claims subject to arbitration deal with the Primary P&I and Hull insurance policies, whereas Excess P&I Underwriters' claims do not involve those policies or challenge any coverage under them.  Rather, Excess P&I asserts that their claim is simple:  Excess P&I Underwriters paid $2.55 million for the removal of the vessel and according to the terms of the Excess P&I policy, they are entitled to a salvage credit.

Excess P&I Underwriters' overlook the fact that the bulk of Moncla Marine's claims allege that the Hull, Primary P&I, and Excess P&I Underwriters manipulated coverage to ensure that the salvage was covered under the P&I policies and not the Hull policy.  Once resolved, this issue could seriously affect Excess P&I Underwriters' right to a salvage credit.  Therefore, although the operative facts might not be identical to command a mandatory stay, the facts do overlap extensively and weigh in favor of a discretionary stay.  See Suzlon, 2010 WL 3540951, at *8 ("Even if the operative facts are not identical . . . . [the] Waste Management factor[] weigh[s] heavily in favor of a discretionary stay. . . . The close relationship between the facts involved in the federal court claims and the arbitration claims counsels in favor of staying this litigation.").

The second Waste Management factor addresses whether the claims asserted in the arbitration and litigation are inherently inseparable.  372 F.3d at 343.  Moncla Marine contends that although Excess P&I Underwriters' claims are not denying coverage, coverage under the Excess P&I policy is contingent upon the existence of the Primary P&I policy.  According to the Excess P&I policy, "[Excess

P&I Underwriters] agree to indemnify the Assured for all liability, loss, damage or expense insured against under the [Primary P&I policies] . . . ."  Therefore, Moncla Marine argues that the claims are inherently inseparable. Excess P&I Underwriters respond that they are not bound to follow Primary P&I Underwriters' coverage determination.  While the Excess P&I policy incorporates the SP-23 form on which the Primary P&I policy is based, the Excess P&I Underwriters submit that the Excess P&I policy has separate applicable law and separate exclusions.  Excess P&I Underwriters continue to explain at length why they are not required to follow Primary P&I Underwriters' coverage position, and agreeing with the Primary P&I Underwriters would be giving them "carte blanche" to control litigation.  The Court finds that the issues might not be "inherently inseparable," but they are intertwined strongly enough to lean in favor of a discretionary stay:  the claims and counterclaims before this Court and the third-party claims at issue in arbitration may ultimately alter Excess P&I's salvage credit.

Last, the Court must consider the third <u>Waste Management</u> factor, which requires determining whether the litigation would have a critical impact on the arbitration.  372 F.3d at 343.  Moncla Marine asserts that if the stay is denied, this Court may reach inconsistent results regarding Moncla Marine's claims that the underwriters conspired to manipulate coverage. Excess P&I Underwriters have also filed a motion to dismiss Moncla Marine's counterclaims.  Even if the Court were to address that motion, and assuming the Court dismisses the counterclaims, the third-party claims (which are nearly identical to the claims Moncla asserts against Excess P&I) still exist and are subject to arbitration.  The Court finds that potentially reaching the conclusion that the underwriters did not conspire would affect the arbitration.  The Fifth Circuit has instructed that "[t]he question is not ultimately one of weighing the potential harm to the interests of the nonsignatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration." <u>Id.</u> at 343 (citing <u>Adams v. Ga. Gulf Corp.</u>, 237 F.3d 538, 541 (5th Cir. 2001)).  Given the binding effect of a federal judgment, as well as the factual similarities in the claims asserted against the third-party defendants, it is not unreasonable to believe that the arbitrator would be influenced to follow the Court's determination.  Therefore, even if the first two

14

<u>Waste Management</u> factors do not support a mandatory stay, all three factors weigh in favor of a discretionary stay. <u>See</u> <u>Suzlon</u>, 2010 WL 3540951, at *8 ("Even if the operative facts are not identical and the claims are not 'inherently inseparable,' the facts and claims significantly overlap.  The first two <u>Waste Management</u> factors at a minimum weigh heavily in favor of a discretionary stay."); <u>see</u> <u>also</u> <u>Shores of Panama, Inc. v. Safeco Ins. Co. of Am.</u>, No. 07-602, 2008 WL 4417558, at *7-8 (S.D. Ala. Sept. 29, 2008) (staying litigation pending arbitration because the litigation required reaching the merits of an arbitrable claim, thwarting the federal policy against rendering arbitration redundant); <u>Midland Walwyn Capital Inc. v. Spear, Leeds & Kellogg</u>, No. 92-2236, 1992 WL 249914, at *2 (S.D.N.Y. Sept. 22, 1992) ("Courts . . . have repeatedly granted stays pending arbitration where the nonarbitrable issues overlap the arbitrable issues, thus minimizing inconsistent results and conserving judicial resources.").

Although the <u>Waste Management</u> factors do not consider whether the outcome of the arbitration would impact litigation (the third factor asks the reverse--the impact of litigation on arbitration), the Court notes that the outcome of arbitration in this case may be helpful to litigation, lending further support to the issuance of a temporary stay.  <u>See</u> <u>Suzlon</u>, 2010 WL 3540951, at *9 ("A discretionary stay of this litigation will also enable the court and the parties to benefit from the outcome of the arbitration."); <u>Med-Im Dev., Inc. v. Gen. Elec. Capital Corp.</u>, No. 07-1618, 2008 WL 901489, at *9 (S.D. Tex. Mar. 31, 2008) (granting a discretionary stay because the litigation would "involve much of the same evidence developed in arbitration"); <u>Halliburton</u>, 2007 WL 268492, at *10 ("The [signatory's] arguments as to the effect of the arbitration on the litigation have greater force as arguments in support of a discretionary stay.").

In addition, although Excess P&I's motion to dismiss was filed first, Excess P&I requested to continue the hearing on the motion "without date."  The Court's policy is not to allow motions to remain pending for an indefinite time period (as Excess P&I requested); therefore, the Court itself selected a hearing date

for Excess P&I's motion.  The Court reemphasizes that "[t]he question is not ultimately one of weighing the potential harm to the interests of the nonsignatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration." Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A., 372 F.3d at 343 (citing Adams v. Ga. Gulf Corp., 237 F.3d 538, 541 (5th Cir. 2001)).

*D.*

Last, Excess P&I submits that the Court failed to undertake the balancing test mandated by the U.S. Supreme Court in Landis v. North American Co. when issuing a discretionary stay.  299 U.S. 248 (1939).  Contrary to Excess P&I's assertion, the Court engaged in balancing the hardships to Excess P&I if a stay were granted with Moncla Marine's concerns regarding arbitration under the Waste Management factors—the very same factors Excess P&I relied on in its opposition papers to Moncla Marine's request for a stay.  See Rosenblatt, 607 F.3d at 419 (noting that a motion for reconsideration is an improper vehicle to raise arguments which could, and should, have been made before the judgment was issued).  The Court nevertheless reaches the same conclusion regarding a discretionary stay under Landis, which expresses general concerns about a court's inherent power to stay cases, unlike Waste Management, which enumerates specific factors for a court to consider when dealing with litigation and arbitration.

16

The Supreme Court in <u>Landis</u> recognized that incidental to a district court's inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants" is "the power to stay proceedings." 299 U.S. at 254.  The Court stated:  "[H]ow this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." <u>Id.</u> at 254-55.  Therefore, a federal district court has "broad" discretionary power to stay proceedings before it, but that power is not "unbounded." <u>Wedgeworth v. Fibreboard Corp.</u>, 706 F.2d 541, 545 (5th Cir. 1983).

The Court first notes that Excess P&I's claim is for a salvage credit.  Recognizing the concerns about the MONCLA 101 depreciating in value during this ongoing dispute, the Court granted Excess P&I's request for an interlocutory sale of the vessel on February 20, 2013.  The Court expressly considered that such a sale would alleviate Excess P&I's expenses in storing the vessel.  (The record does not indicate whether the sale has occurred or if the proceeds have been deposited into the registry of the Court—but the burden to do so is not on the Court.) Therefore, steps have been taken to preserve the ultimate right to be recovered here (a sum of the salvage proceeds). <u>Cf. id.</u> (noting that the realities of the hardship of a stay on the plaintiffs is "substantial" because personal injuries were

involved, making the recovery of damages more pressing).  The
issues to be determined involve whether multiple insurers are
entitled to recover from the proceeds (and in what order),
assuming recovery is not precluded by the insurers' alleged
misconduct.  Although the Court recognizes the delay that
accompanies a stay can be frustrating, the Court reiterates its
concern that any judgment as to Excess P&I's right to a salvage
credit may destroy Moncla Marine's right to a meaningful
arbitration with the Hull and Primary P&I Underwriters.  See
Waste Mgmt., 372 F.3d at 343 ("The question is not ultimately one
of weighing the potential harm to the interests of the
nonsignatory, but of determining whether proceeding with
litigation will destroy the signatories' right to a meaningful
arbitration." (citing Adams, 237 F.3d at 541)); see, e.g.,
Suzlon, 2010 WL 3540951, at *8 ("Even if the operative facts are
not identical and the claims are not 'inherently inseparable,'
the facts and claims significantly overlap.  The first two Waste
Management factors at a minimum weigh heavily in favor of a
discretionary stay."); Shores of Panama, Inc. v. Safeco Ins. Co.
of Am., No. 07-602, 2008 WL 4417558, at *7-8 (S.D. Ala. Sept. 29,
2008) (staying litigation pending arbitration because the
litigation required reaching the merits of an arbitrable claim,
thwarting the federal policy against rendering arbitration
redundant); Midland Walwyn Capital Inc. v. Spear, Leeds &

18

Kellogg, No. 92-2236, 1992 WL 249914, at *2 (S.D.N.Y. Sept. 22, 1992) ("Courts . . . have repeatedly granted stays pending arbitration where the nonarbitrable issues overlap the arbitrable issues, thus minimizing inconsistent results and conserving judicial resources.").  To a certain extent, Excess P&I recognizes that there are competing interests among the insurers regarding distribution of proceeds.  The record includes a letter sent from counsel for Excess P&I to the other insurance companies, stating that "[t]he purpose of this correspondence is to further a discussion and, to the extent possible, come to a resolution on both the disposition of the barge and the disposition of salvage proceeds." See Rec Doc. 25-3 at 1.  The letter then elaborates as to explain why Excess P&I believes its claim to proceeds is entitled to priority.  Therefore, for the reasons already articulated in its April 11, 2013 Order and Reasons, and for the reasons restated here, the Court finds a discretionary stay to be proper.  This is not to say that Excess P&I is precluded from requesting that the Court reconsider lifting the stay, which it is free to do at any time.  In addition, the Court will modify the stay previously entered to allow counsel in this case to submit status reports on the ongoing arbitration in six months from the date of this decision, if counsel feel that such a submission will be helpful to the Court.

19

*II.*

The Court also finds an interlocutory appeal is unwarranted. The issues presented by Excess P&I are whether this Court "exceeded its discretion in entering an indefinite stay as to the claims of a nonsignatory plaintiff against a signatory defendant upon motion of the signatory defendant," and whether "common claims under the <u>Waste Management</u> analysis must be colorable to support a claim." The Court notes that Excess P&I's disagreement with the Court's discretionary action and its application of legal principles to the facts of this case cannot be characterized as a controlling issue of law so as to create an appealable issue. Matters within a district court's discretion are typically not appropriate for § 1292(b) certification. <u>See, e.g.</u>, <u>Garner v. Wolfinbarger</u>, 433 F.2d 117, 120 (5th Cir. 1970) ("We are of the view that §1292(b) review is inappropriate for challenges to a judge's discretion in granting or denying transfers . . . . The Congressional policy against piecemeal appeals, as expressed in the final judgment rule, 28 U.S.C. § 1291, to which §1292(b) is a narrow exception, is eroded by permitting review of exercise of the judge's discretion . . . ."); <u>Texaco, Inc. v. Duhe</u>, 44 F. Supp. 2d 809, 812 (W.D. La. 1998) ("Matters regarding the exercise of judicial discretion do not fall within the ambit of controlling questions of law." (internal quotation marks omitted)); <u>Mobil Oil Corp. v. W.R.</u>

Grace & Co., 334 F. Supp. 117, 132 (S.D. Tex. 1971) ("[A]ll that
remains is plaintiff's disagreement with this Court's application
of settled legal principles to the facts of this case.  Such a
discretionary ruling is not within the limited class of cases set
out in 28 U.S.C. § 1292(b) for certification.").  Moreover, a
question of law is controlling if reversal would terminate the
litigation, which is clearly not the case here.  At best,
reversal would put the parties back at the starting point, for a
scheduling order has yet to be issued in this case.  See, e.g.,
McAuslin v. Grinnell Corp., No. 97-775, 2000 WL 1251966, at *2
(E.D. La. Sept. 5, 2000) ("[A] question of law is controlling if
reversal would terminate the litigation." (citing Northfield Ins.
Co. v. George E. Buisson Realty Co., No. 99-151, 1999 WL 777721,
*2 (E.D. La. Sept. 28, 1999))).

     The Court also finds that Excess P&I fails to show a
substantial ground for difference of opinion.  Courts have held
that a substantial ground for difference of opinion exists where

> "a trial court rules in a manner which appears contrary
> to the rulings of all Courts of Appeals which have
> reached the issue, if the circuits are in dispute on the
> question and the Court of Appeals of the circuit has not
> spoken on the point, if complicated questions arise under
> foreign law, or if novel and difficult questions of first
> impression are presented." But simply because a court is
> the first to rule on a question or counsel disagrees on
> applicable precedent does not qualify the issue as one
> over which there is substantial disagreement.

Ryan v. Flowserve Corp., 444 F. Supp. 2d 718, 723-24 (N.D. Tex.
2006) (citation omitted) (quoting 4 Am. Jur. 2d Appellate Review

§ 128 (2005)).  As explained herein, Excess P&I's assertions are merely disagreements as to applicable precedent.  See Clark-Dietz, 702 F.2d at 68 (noting that "[a]n interlocutory appeal assuredly does not lie simply to determine the correctness" of a ruling).  Having found that the case involves neither a controlling issue of law or substantial disagreement, the Court need not determine whether immediate appeal would materially advance the termination of the litigation.  See Panda Energy Int'l, Inc. v. Factory Mut. Ins., No. 11-003, 2011 WL 610016, at *4 (N.D. Tex. Feb. 14, 2011) ("Every ground in § 1292(b) must be met in order for the interlocutory appeal to be considered; these are not factors to be weighed and balanced." (citing Ahrenholz v. Bd. of Tr. of Univ. of Ill., 219 F.3d 674, 676 (7th Cir. 2000)).

Accordingly, Excess P&I Underwriters' motion for reconsideration, or, in the alternative, motion for 28 U.S.C. § 1292(b) certification is DENIED.


New Orleans, Louisiana, June 12, 2013


MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE


22